**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **B.F.G., by his parents and next friends,** | ) | |
| **R.G. and B.G., and R.G. and B.G.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **No. 08 C 1565** |
| | ) | |
| **v.** | ) | **HON. SUZANNE B. CONLON** |
| | ) | **Judge Presiding** |
| **WILLIE BLACKMON, Investigator,** | ) | |
| **Division of Child Protection ("DCP"), of** | ) | **Magistrate Judge Nan R. Nolan** |
| **The Illinois Department of Children and** | ) | |
| **Family Services ("DCFS"), *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT CASADY'S MOTION TO DISMISS THE AMENDED COMPLAINT

Now comes defendant, Rhonda Casady ("Casady"), by and through her undersigned attorneys, and hereby moves this Court for an order dismissing the Amended Complaint pursuant to Fed. R. Civ. P 12(b)(6). In support thereof, Defendant states as follows:

### THE CLAIMS

B.F.G. and his parents, R.G. and B.G., have filed a sixteen count Amended Complaint with a catalog of claims against the state officials who investigated and prosecuted the report of sexual abuse against B.F.G., and the parents of the alleged child victims. In their Amended Complaint, Plaintiffs have brought the following claims against Casady:

> Violation of substantive due process under 42 U.S.C. §1983, by "indicating" additional allegations of sexual penetration, sexual molestation, substantial risk of physical injury and substantial risk of sexual injury (Count IV);

> Violation of due process under 42 U.S.C. §1983, by preventing a fair hearing on his administrative appeal (Count VI);

>     Conspiracy to unlawfully arrest, falsely "indicate" and deny a fair administrative

>     hearing under 42 U.S.C. §1983 (Count VII);

>     State law malicious prosecution (Count VIII);

>     State law conspiracy to unlawfully arrest, falsely "indicate" and deny a fair

>     administrative hearing (Count IX); and

>     State law intentional infliction of emotional distress (Count XI).

All of the allegations against defendant Casady are based upon her actions in prosecuting the expungement hearing on behalf of the Illinois Department of Children and Family Services ("the Department" or "DCFS").

## INTRODUCTION

In a state administrative hearing, B.F.G. had a report expunged that he sexually abused neighbor children for whom he was babysitting.  The Illinois Department of Children and Family Services ("the Department" or "DCFS") is the state agency required by Illinois statute to receive and investigate reports of child abuse and neglect.  *See* 325 ILCS 5/7.3.  At the conclusion of a Department investigation, a report is either "indicated"[1], "unfounded"[2] or "undetermined"[3].  *See* 325 ILCS 5/7.12.  If the report is "indicated" against an individual, the Department places a record of that person's name on the State Central Register, *Id.* at 7.16, where it is maintained until time for its removal from the Register pursuant to Department rule. *See* 89 Ill. Admin. Code 431.30, a copy of which is attached here as Exhibit A. The Department must provide anyone who is

---

[1]  A report is "indicated" if an investigation determines that credible evidence of the alleged abuse or neglect exists. 325 ILCS 5/3.
[2]   A report is "unfounded" if it is determined after an investigation that no credible evidence of abuse or neglect exists. *Id.*
[3]  A report is "undetermined" if it was not possible to initiate or complete an investigation on the basis of information provided to the Department. *Id.*

"indicated" for child abuse or neglect an opportunity for a hearing to appeal the indicated report and to request expungement of his name from the State Central Register. *Id.*

All of the allegations against Casady arise from her legal representation of the Department in B.F.G.'s appeal hearing of the indicated report that he sexually abused the neighbor children, J.S. and N.S., while babysitting them. (Am. Comp. ¶6.) Specifically, Plaintiffs complain about Casady's prosecutorial decision to increase or amend the Department's allegations against B.F.G. (Am. Comp. ¶¶ 43(a), 67, 82, 85, 86, 92) and to many aspects of her trial strategy, including the manner of her objections, and presentation of evidence and the alleged suppression of exculpatory evidence. (Am. Comp. ¶¶ 77, 82, 92, 99.)

Because all of the conduct complained of involves Casady's prosecutorial functions, Casady has absolute prosecutorial immunity from all of the claims in the Amended Complaint. In the alternative, if this Court finds that Casady is not entitled to absolute immunity, then she is entitled to qualified immunity on all of the federal claims. Plaintiffs cannot show they have any clearly established constitutional right that Casady has violated. Moreover, a reasonable person, in Casady's position could have believed based upon the specific facts confronting her, that her actions were well within the contours of the constitution.

Furthermore, with respect to the state law claims, even without absolute immunity, the claim for malicious prosecution must be dismissed because this Court has already found probable cause. *See* Memorandum Opinion and Order dated July 21, 2008 (July 21, 2008 Order), Dkt. No. 115. Similarly, Plaintiffs' claims for Intentional Infliction of Emotional Distress fail because the allegations do not rise to the level of extreme and outrageous.

For all of the foregoing reasons, and for all of the support found in this memorandum, the claims against Casady should be dismissed with prejudice.

## FACTUAL BACKGROUND

In a motion to dismiss pursuant to Rule 12(b)(6), the court takes all well-pleaded factual allegations in the complaint as true and makes all plausible inferences from those allegations in the plaintiffs' favor. *Levy v. Pappas*, 510 F.3d 755, 764 (7th Cir. 2007). For the purpose of this motion to dismiss, the following claims will be taken as true:[4]

Casady represented the Department at B.F.G.'s hearing to expunge the indicated report against him. (Am. Comp. ¶ 6). Plaintiffs allege that Casady unilaterally "indicated" additional charges against B.F.G. (Am. Comp. ¶ 43(a)); that Casady conspired to hide key physical evidence from the court (Am. Comp. ¶ 43(c)); that Casady lied to the court in order to cover-up the true circumstances surrounding the suppression (Am. Comp. ¶ 43(d)); that Casady refused to cooperate with the court's efforts to investigate the suppression of the evidence (Am. Comp. ¶ 43(e)); that Casady tactically disrupted the presentation of evidence through repeated delays, causing the hearing to drag on for months (Am. Comp. ¶ 43(a)); that Administrative Law Judge (ALJ) Fahler filed a complaint with the Illinois Attorney Registration regarding Casady's conduct (Am. Comp. ¶ 43(h))[5]; that ALJ Baechle repeatedly threatened to eject and ultimately did eject Casady from the hearing (Am. Comp. ¶ 43(i)); and that ALJ Baechle found that DCFS had not met its burden in proving the allegations against B.F.G. and further found that B.F.G. "is not a perpetrator of child abuse." (Am. Comp. ¶ 44).

---

[4] Defendant Casady, however, categorically denies the wrongful conduct alleged against her in the Amended Complaint but recognizes that for purposes of this motion she must proceed under the applicable standard.
[5] That investigation is confidential; therefore, this allegation should be stricken. *See* IL Sup. Ct. Rule 766(a). In any event, this allegation does not state a Due Process or any other Constitutional violation.

## ARGUMENT

**I.    As An Attorney Representing The State Of Illinois, Casady Is Protected By Absolute Immunity**

Prosecutors are entitled to absolute immunity from civil liability under 42 U.S.C. § 1983 for actions they have undertaken pursuant to their official duties when they are acting as an advocate, "activities [which] were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). Absolute immunity also protects those who participate in adjudications within a federal administrative agency. *Butz v. Economou*, 438 U.S. 478, 512-13 (1978). "Absolute immunity covers prosecutorial functions such as the initiation and the pursuit of a criminal prosecution, the presentation of the state's case at trial, and other conduct that is 'intimately associated' with the judicial process." *Mendenhall v. Goldsmith*, 59 F.3d 685, 689 (7th Cir. 1995). Absolute immunity extends to agency officials performing functions analogous to those of a prosecutor, *Id.* at 690, as well as government officials outside of the criminal context who exercise prosecutorial or judicial functions. *Simonsen v. Board of Educ. of City of Chicago*, No. 01 C 3081, 2002 WL 230777, *9 (N.D. Ill. February 14, 2002). "For purposes of immunity analysis, federal officials are indistinguishable from state officials and receive no greater degree of protection from constitutional claims." *Mendenhall*, 59 F.3d at 690.

In *Butz*, the Court found that a Department of Agriculture attorney who tried to revoke the registration of a commodity futures commission merchant functioned similarly to a prosecutor. The Court reasoned that agency officials performing functions analogous to those of a prosecutor should be able to claim absolute immunity with respect to such acts. *Butz*, 438 U.S. at 515. The Court further reasoned that if executive officials did not have immunity, their discretion with respect to the initiation of administrative proceedings might be distorted. *Id.* Because of the

similarity between a prosecutor's role and that of an attorney presenting evidence in an agency hearing, the Court also held that an agency attorney who arranges for the presentation of evidence on the record in the course of an adjudication is absolutely immune from suits based on the introduction of such evidence. *Id.* at 517-18.

Whether absolute immunity extends to a particular situation depends on a functional analysis of the defendant's role. If the defendant's role is functionally analogous to that of a judge or prosecutor, he is entitled to absolute immunity for actions taken pursuant to those roles. *Simonsen,* 2002 WL 230777 at 9.

Absolute immunity has been afforded to social workers in child custody cases for prosecutorial acts, *Millspaugh v. County Dept. of Public Welfare of Wabash County*, 937 F. 2d 1172, 1175-76 (7th Cir. 1001). Absolute immunity has been afforded to lawyers prosecuting a plaintiff teacher's dismissal hearing on behalf of the School Superintendent who brings the charge, *Simonsen*, 2002 WL 23077 at 10 (attorney's "role in dismissal hearing is functionally equivalent to that of a criminal prosecutor … they must exercise discretion in deciding what evidence to present in the hearing, and they are entitled to absolute immunity for these choices"). Finally, absolute immunity has been afforded to officials of the Illinois Department of Children and Family Services for their conduct during judicial proceedings. *Potts v. O'Malley*, No. 95 C 5171, 1995 WL 745960, *3 (N.D. Ill. December 1, 1995). *See also*, *Walden v. Wishengrad*, 745 F.2d 149 (2nd Cir.1984) (Court found that attorney for a social services department's "position and responsibilities in this case were similar to those of a prosecuting attorney," and entitled to the same absolute immunity as a prosecuting attorney for decision to request and obtain arrest warrant for non-cooperative witness); *Clulow v. State of Oklahoma*, 700 F.2d 1291, 1298 (10th Cir. 1983) ("bar officials charged with the duties of investigating, drawing up, and presenting cases involving

attorney discipline enjoy absolute immunity from damage claims for such functions" (citations omitted)).

In the case at bar, all of the conduct about which Plaintiffs complain fits squarely within Casady's prosecutorial functions and accordingly she is entitled to absolute immunity. Casady was, at all relevant times, an attorney who represented DCFS in B.F.G.'s administrative appeal and acted under color of state law. (Am. Comp. ¶ 6.)  Everything Casady did which Plaintiffs claim is actionable occurred while she was "providing attorney services" to DCFS in the administrative proceeding, to wit, in preparing the Department's case for hearing, or in presenting the Department's case at the hearing. (Am. Comp. ¶ 6.)  Amending charges (Am. Comp. ¶ 43(a)); presenting (or not presenting) evidence (Am. Comp. ¶ 43(c)); making decisions regarding the presentation of evidence including seeking continuances (Am. Comp. ¶ 43(a)) are all quintessential prosecutorial functions which are entitled to immunity.  Immunity extends to all stages of the case, from preparation to closing arguments, for all the actions taken by Casady in the representation of the Department in connection with B.F.G.'s expungement appeal hearing. Plaintiffs' sinister characterizations of Casady's conduct has no impact on whether Casady is entitled to immunity.  "[I]mmunity that applies only when the defendant did nothing wrong is no immunity at all." *Millspaugh*, 937 F. 2d at 1175.  Accordingly, all allegations in the Amended Complaint against defendant Casady must be dismissed.

## II.     Even If Casady Does Not Have Absolute Immunity, Casady Is Entitled To Qualified Immunity For All Federal Claims

To the extent that any of Casady's conduct about which Plaintiffs complain can be characterized as investigative, she is entitled to qualified immunity.  *See Mendenhall*, 59 F3d at 689.  Whether or not a public official has qualified immunity is a question of law for the judge to decide.  *See Whitt v. Smith*, 832 F.2d 451, 453 (7th Cir. 1987). "The doctrine of qualified

immunity shields public officials performing discretionary functions from liability for civil damages where their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jones v. Watson*, 106 F.3d 774, 778 (7th Cir. 1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Essentially, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Public officials are entitled to qualified immunity if the plaintiff fails to show that the official's conduct violated a constitutional right or if the right allegedly violated was not clearly established. *Saucier v. Katz*, 121 S.Ct. 2151, 2156 (2001).

The Supreme Court observed, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Id.* Moreover, the law must "put the [official] on notice that his conduct would be clearly unlawful, [otherwise] summary judgment on qualified immunity is appropriate." *Id.* at 2156-57.

Plaintiffs' complaint contains two counts which purport to allege federal claims against Casady. Count IV, entitled "Substantive Due Process – 42 U.S.C. § 1983," alleges that B.F.G. enjoyed a liberty interest under the due process clause of the Fourteenth Amendment to be free from the consequences and stigma of an "indicated" finding by DCFS on charges of sexual misconduct. (Am. Comp. ¶ 65). Plaintiffs allege that Casady further violated this "liberty" interest "by indicating B.F.G. on charges of sexual penetration, sexual molestation, substantial risk of physical injury and substantial risk of sexual injury." (Am. Comp. ¶ 67).

B.F.G. has no right or liberty interest to be free from being indicated by the Department for child abuse, if the Department has credible evidence of child abuse. The Seventh Circuit has upheld against a constitutional challenge the Department's use of credible evidence as the standard

to "indicate" or substantiate reports of child abuse.  *Dupuy v. Samuels*, 397 F.3d 493, 506-7 (7th Cir. 2005).  According to DCFS regulations, "credible evidence ... means that available facts, when viewed in the light of surrounding circumstances, would cause a reasonable person to believe that a child was abused or neglected." *See* 89 Ill. Admin. Code 300.20, a copy of which is attached here as Exhibit B.  By contrast, in an expungement hearing, an administrative law judge makes a recommendation whether "there is a preponderance of evidence of abuse or neglect based on the information in the administrative record." *See* 89 Ill. Admin. Code 336.120(b)(15), a copy of which is attached here as Exhibit C.  The finding of credible evidence after the investigation is not inconsistent with the more stringent preponderance of the evidence standard, which is required in an expungement hearing.

B.F.G. did have a right to a hearing to clear his name after he was indicated by the Department for child abuse.  He was given a hearing which resulted in the expungement of the report. (Am. Comp. ¶¶ 41-44).  This fully satisfied due process requirements.   As a result of the expungement, B.F.G.'s name is no longer listed on the State Central Registry. *See* 325 ILCS 7.16.

Moreover, the infliction by state officials of a "stigma" to one's reputation alone is not a "liberty" interest sufficient to invoke the protections of the Due Process clause.  *Paul v. Davis*, 424 U.S. 693, 701 (1976).  There is no constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the Due Process clause.  *Id.* at 702. Because defamation is not actionable under section 1983, Plaintiffs claim fails to allege a violation of a constitutional right and Casady is entitled to qualified immunity.

However one characterizes this claim, Plaintiffs cannot cite any case that clearly establishes that in May, 2007, Casady's prosecutorial decision to amend the charges against B.F.G. clearly violated any of his constitutional rights.  Moreover, a reasonable official, standing

in Casady's shoes, could have believed based upon the specific facts confronting her, that her actions were well within the contours of the Constitution. Accordingly, Casady is entitled to qualified immunity on Count IV.

Count VI, entitled "Due Process– 42 U.S.C. § 1983" alleges that B.F.G. enjoyed the right to a fair administrative hearing under the Fourteenth Amendment. (Am. Comp. ¶ 76). Plaintiffs allege that Casady violated B.F.G.'s right to a fair and full administrative hearing by suppressing exculpatory evidence and preventing B.F.G. from receiving a timely hearing. (Am. Comp. ¶ 77). *Brady v. Maryland*, 373 U.S. 83 (1963), requires a criminal prosecutor to disclose exculpatory material to the defendant in a criminal proceeding. There is no parallel to *Brady* in civil litigation. *Millspaugh*, 937 F.2d at 1175, n. 1. *See also*, *Burkybile v. Mitsubishi Motors Corp.*, No. 04 C 4932, 2006 WL 2325506, *2 (N.D. Ill. August 2, 2006) (no obligation comparable to *Brady* imposed on parties in civil cases where evidence would derive from non-testifying expert). The administrative appeal that B.F.G. requested pursuant to the Abused and Neglected Child Reporting Act, 325 ILCS 5/7.16 (Am. Comp. ¶ 41) was a civil proceeding. Accordingly, *Brady* does not apply.

Even if *Brady* applies to civil proceedings, Plaintiffs cannot meet the materiality requirement set forth in *Brady v. Maryland*, 373 U.S. 83. The only claim at Plaintiffs' disposal to seek redress for the alleged withholding of evidence[6] is a due process claim, specifically a due process claim based upon a *Brady* violation. *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001). In order to prevail on a due process claim, Plaintiffs must establish that Defendant Casady deprived them of their right to a fair trial under *Brady*, by deliberately withholding material

---

[6] As an initial matter, it is difficult to understand in light of Plaintiffs' allegations how Casady both "suppressed" evidence, (¶43(c) of Am. Comp.) and lied to the court about the suppression (¶43(d) of Am. Comp.) and refused to cooperate with the court's efforts to investigate the suppression (¶43(e) of Am. Comp.). If the court was inquiring about and investigating the "suppression" then the court obviously knew about the evidence and, by definition, it was not suppressed.

exculpatory evidence.  *Newsome*, 256 F.3d at 751-52.   Thus, Plaintiffs must prove: 1) that B.F.G.'s *Brady* rights were violated during his underlying criminal trial; and 2) that defendant's deliberate acts proximately caused his constitutional injury.  "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Green*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948 (1999).  Stated differently, a *Brady* violation is established when "(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to an issue at trial."  *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir.2001). *See also U.S. v. Walton*, 217 F.3d 443, 450 (7th Cir. 2000).

Under *Brady*, prejudice or materiality means "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 1565 (1995) (citations omitted).   A reasonable probability is one that is sufficient to undermine confidence in the outcome of the trial. *Id*., 514 U.S. at 434, 115 S.Ct. at 1565.  Materiality is not established by "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial . . . ." *U.S. v. Agurs*, 427 U.S. 97, 109-10, 96 S.Ct. 2392, 2400 (1976).  Any evidence allegedly concealed from a plaintiff during his criminal trial is not material in *Brady* terms because, where the plaintiff was acquitted, there was no reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed. *Gregory v. Oliver*, 226 F. Supp. 2d 943, 953 (N.D. Ill. 2002) (Shadur, J.)  *See also*, *Sears v. City of Chicago*, No. 84 C 3678, 1986 WL 5209, *5 n.5 (N.D. Ill April 28, 1986) (Rovner, J.)("Thus, given that [plaintiff] was acquitted at trial, under any of the definitions of materiality utilized by the courts

the evidence allegedly suppressed at [plaintiff's] trial could not be considered material ... Thus, [plaintiff's] Brady right was clearly not violated.") (citations omitted).[7]

Here, the administrative decision was decided in B.F.G.'s favor. (Am. Comp. ¶ 44). Accordingly, any evidence purportedly withheld could not be considered material in *Brady* terms. Plaintiffs' claim fails to allege a violation of a constitutional right and Casady is entitled to qualified immunity.   Moreover, a reasonable official, standing in Casady's shoes, could have believed based upon the specific facts confronting her, that her actions were well within the contours of the constitution.   Accordingly, Casady is entitled to qualified immunity on Plaintiffs' claim that she suppressed exculpatory evidence.

To the extent that Plaintiffs allege a due process violation based upon the timeliness (or untimeliness) of the hearing Plaintiffs cannot cite any case that clearly establishes that in May, 2007, Casady's prosecutorial decision to seek continuances, clearly violated any of his constitutional rights.   Moreover, a reasonable official, standing in Casady's shoes, could have believed that based upon the specific facts confronting her, that her actions were well within the contours of the constitution.   Accordingly, Casady is entitled to qualified immunity on Count IV.

### III.    Plaintiffs' Section 1983 and State Law Conspiracy Claims Fail [8]

Plaintiffs' section 1983 conspiracy claim derive from their Due Process claims as alleged in Counts IV and VI.   A section 1983 conspiracy count cannot stand where the complaint "neither alleges any injury over and above the underlying torts at issue nor casts the net of liability over any additional defendants not otherwise reached," such that the plaintiff had been "prevented from pursuing a tort action or that the value of any such action has been reduced by

---

[7] *Contra Carroccia v. Anderson* 249 F. Supp.2d 1016 (N.D.Ill 2003) (Kennelly, J.); *Craig v. Huayamave*, No. 05 C 172, 2005 WL 1564982 (N.D. Ill, June 9, 2005) (St. Eve, J.).

[8] In Counts VII and IX, Plaintiffs allege that Casady conspired to remove B.F.G. from his home and to falsely arrest him. However, based upon Plaintiffs' own allegations in ¶42 of the Amended Complaint, defendant Casady had no involvement in the case prior to May of 2007.

the cover up." *Hawkins v. Mathus*, No. 99 C 901, 1999 WL 966128, *3 (N.D. Ill. October 8, 1999) (Pallmeyer, J.); *Mendez v. Henniger*, No. 98 C 2694, 1999 WL 202907, *4 (N.D. Ill. March 29, 1999) (Gottschall, J.); *see also Ingram v. Jones*, No. 95 C 2631, 1996 WL 355365, *2 (N.D. Ill. June 21, 1996)(Nordberg, J.) (concealment of constitutional violations such as excessive force does not amount to separate constitutional violation of conspiracy unless victim alleges deprivation of access to the courts). Such is the case here. Moreover, as this Court recognized in its July 21, 2008 Order, a conspiracy claim cannot stand when the underlying claim is dismissed. *See* July 21, 2008 Order, p. 5, Dkt. No. 115. Thus, Plaintiffs' section 1983 and state law conspiracy claims against defendant Casady must be dismissed.

### IV.    The State Law Malicious Prosecution Claim Must be Dismissed

Pursuant to the motion to dismiss filed by Defendants J.S. and K.S. this Court has already dismissed Count VIII. *See* July 21, 2008 Order; Dkt. No. 115. To the extent that claim was only dismissed as to Defendants J.S. and K.S., the Court's analysis applies with equal force to Defendant Casady. As this Court noted, to prevail on a malicious prosecution claim under Illinois law, a plaintiff must show each of the following: (1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages. *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 921-22 (7th Cir. 2001). The absence of even one of these elements will preclude recovery for malicious prosecution. *Id.* at 922 (*citing Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir. 1997)). The existence of probable cause is a complete defense to a malicious prosecution claim. *Id.* at 926. "The Complaint reflects probable cause existed for B.F.G.'s arrest." *See* July 21, 2008 Order.

Accordingly, to the extent the claim still exists against Casady, Count VIII must be dismissed as to Casady.

### V.    The Intentional Infliction of Emotional Distress Claim Must Be Dismissed

Plaintiffs' claim for intentional infliction of emotional distress also fails because the facts do not show that Casady engaged in "extreme and outrageous" conduct.  To state a claim for intentional infliction of emotional distress, a plaintiff must allege: (1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress or knew that there was a high probability that his conduct would do so; and (3) the defendant's conduct actually caused severe emotional distress.  *Cangemi v. Advocate South Suburban Hosp.*, 364 Ill.App.3d 446, 470 (1st Dist. 2006).  In addition, the complaint "must be specific and detailed beyond what is normally considered permissible in pleading a tort action."  *Welsh v. Commonwealth Edison Co.,* 306 Ill.App.3d 148, 155, 713 N.E.2d 679 (1st Dist. 1999).

Casady's conduct, if the allegations of Plaintiffs' Amended Complaint are taken as true, does not reach the required standard of "extreme and outrageous."  Liability arises only where the conduct complained of was "atrocious, and utterly intolerable in a civilized community."  *Pavlik v. Kornhaber*, 326 Ill.App.3d 731, 743-44 (2001) (*quoting* Restatement (Second) of Torts § 46, Comment d, at 73 (1965)).  Here, none of Casady's prosecutorial decisions, including amending the charges, seeking continuances, and/or presenting evidence, rise to the level of extreme and outrageous.  Accordingly, Count XI must be dismissed.

**CONCLUSION**

For all of the reasons set forth above, defendant Casady respectfully requests that her motion to dismiss be granted, thereby dismissing all claims against her in this matter.

Dated: August 7, 2008                              Respectfully submitted,


                                                   By: s/ Eileen E. Rosen
                                                   One of the Defendant's Attorneys



Eileen E. Rosen
John J. Rock
Stacy A. Benjamin
Silvia Mercado Masters
ROCK FUSCO, LLC
321 N. Clark Street, Suite 2200
Chicago, IL 60610
(312) 494-1000

## <u>CERTIFICATE OF SERVICE</u>

I, Eileen E. Rosen, one of the attorneys for Rhonda Casady, hereby state that I caused a

copy of **Defendant Rhonda Casady's Motion to Dismiss the Amended Complaint**, attached

hereto, to be served upon:

James G. Sotos
Julie K. Bisbee
James G. Sotos & Assoc.
550 E. Devon, Suite 150
Itasca, IL 60143

Lance D. Northcutt
Berg Northcutt & Berg
2100 W. 35th Street
Chicago, IL 60609

Stacy McGlynn Atkins
Jason C. Callicoat
Paul A. Rettberg
Querrey & Harrow, Ltd.
175 W. Jackson Blvd., Suite 1600
Chicago, IL 60604

Daniel M. Noland
Sonia A. Desai
Molly E. Thompson
Dykema Gossett PLLC
10 South Wacker Drive, Suite 2300
Chicago, IL 60606

Rhonda L. Casady
200 S. Michigan Ave., Ste. 1240
Chicago, IL 60604

Michael D. Ettinger
Cheryl A. Schroeder
Ettinger, Besbekos, Parisi
12413 S. Harlem, # 203
Palos Hills, IL 60453

Patrick Ross Grady
Law Offices of Wolf & Wolfe, Ltd.
25 E. Washington Street, Suite 700
Chicago, IL 60602

Barbara Lynn Greenspan
Attorney General's Office
100 W. Randolph Street, Suite 4-600
Chicago, IL 60601

Michael J. McGrath
Odelson & Sterk, Ltd.
3318 W. 95th Street
Evergreen Park, IL 60805

James C. Stevens, Jr.
Attorney General's Office
100 W. Randolph Street, Suite 11-200
Chicago, IL 60601

via E-FILING on Thursday, August 7, 2008.

s/ Eileen E. Rosen
Eileen E. Rosen

## Joint Committee on Administrative Rules
# ADMINISTRATIVE CODE

TITLE 89: SOCIAL SERVICES
CHAPTER III: DEPARTMENT OF CHILDREN AND FAMILY SERVICES
SUBCHAPTER f: GENERAL ADMINISTRATION
PART 431 CONFIDENTIALITY OF PERSONAL INFORMATION OF PERSONS SERVED BY THE DEPARTMENT OF
CHILDREN AND FAMILY SERVICES
SECTION 431.30 MAINTENANCE OF RECORDS

---

### Section 431.30  Maintenance of Records

a)     The Department, through its institutions, facilities and various offices shall maintain a record on all persons receiving services from the Department, either directly or through the purchase of services, and on all persons for whom a child abuse or neglect report has been indicated, unfounded, or for whom a decision about the report has not yet been made. Upon request from the subjects of the report, the Department may keep records of unfounded reports of child abuse or neglect to prevent future harassment of the subjects. Additionally, in accordance with Section 7.17 of the Abused and Neglected Child Reporting Act [325 ILCS 5/7.17], the Department may maintain case records containing identifying information related to child abuse or neglect reports.

b)     The retention schedule for indicated, unfounded, undetermined and pending child abuse and neglect records is based on the seriousness of the allegations described in 89 Ill. Adm. Code 300, Appendix B, as follows:

1)     50 Years
All reports where allegations regarding the death of the child subject (Allegation #1/51) or sexual penetration (Allegation #19) were indicated shall be retained for 50 years after the report was indicated.

2)     20 Years

A)     The following allegations involving the serious physical injury, sexual molestation or sexual exploitation of the child subject shall be retained for 20 years.

| #2/52 | Head Injuries |
|-------|---------------|
| #4/54 | Internal Injuries |
| #5/55 | Burns/Scalding (Third Degree Burns Only) |
| #7/57 | Wounds |
| #9/59 | Bone Fractures (Multiple or Spiral Fractures Only) |
| #16 | Torture |
| #18 | Diseases Transmitted Sexually |
| #20 | Sexual Exploitation |
| #21 | Sexual Molestation |



| #81 | Failure to Thrive |
| #83 | Malnutrition |
| #85 | Medical Neglect of Disabled Infants |

B)    The following allegations may be retained for 20 years, depending on the seriousness of the injury.

| #6/56 | Poison/Noxious Substances |
| #9/59 | Bone Fractures (Other than Multiple or Spiral Fractures) |
| #11/61 | Cuts, Bruises, Welts, Abrasions and Oral Injuries |
| #12/62 | Human Bites |
| #13/63 | Sprains, Dislocations |
| #14 | Typing/Close Confinement |
| #15/65 | Substance Misuse |
| #75 | Abandonment/Desertion |
| #79 | Medical Neglect |

The following factors shall be used to determine whether to retain any of the above allegations for 20 years:

Extent of the injuries.  Are the injuries limited to one spot on the child's body or are there multiple injuries on many parts of the child's body?

Long-term effects of the injuries.  Will the child be left with scars, deformities or permanent disabilities?

Medical treatment required.  Does the child require hospitalization, surgery, emergency medical treatment or other major medical treatment as a result of the injuries?

Pattern or chronicity of injuries.  Is there an ongoing history or pattern of harsh punishment or neglect that resulted in injury?  Are there severe injuries at different stages of healing?

If none of the above factors are present, the allegations shall be retained for five years.

3)    5 Years

The following indicated allegations shall be retained for five years.

| #17/67 | Mental Injury |
| #10/60 | Substantial Risk of Physical Injury |
| #22 | Substantial Risk of Sexual Injury |
| #74 | Inadequate Supervision |
| #76 | Inadequate Food |

| #77 | Inadequate Shelter |
|------|----------------------|
| #78 | Inadequate Clothing |
| #82 | Environmental Neglect |
| #84 | Lock-Out |

4)    Subsequent Indicated Reports
All subsequent indicated reports involving any of the same subjects or the sibling or offspring shall be maintained after the last report was indicated in accordance with retention periods specified in this Section.

5)    Unfounded Allegations
All identifying information concerning records of unfounded reports involving the death (Allegation #1/51), sexual abuse (Allegations #18, 19, 20, 21) or serious physical injury (e.g., Allegations #2/52, 4/54, 5/55, 7/57, 9/59) of a child shall be maintained in the State Central Register for three years after the date the final finding report is entered. All identifying information about unfounded reports made by mandated reporters involving Allegations #6/56, 11/61, 12/62, 13/63, 14, 15/56, 75, and 79 shall be retained by the SCR for 12 months after the date the final finding report is entered. Additionally, those unfounded reports of physical injury made by mandated reporters not retained by the State Central Register for three years shall be retained for 12 months after the date the final finding report is entered.

All identifying information concerning unfounded reports involving Allegations #17/67, 10/60, 22, 74, 76, 77, 78, 82, and 84 made by a mandated reporter shall be maintained by the SCR for 60 days after the final finding report is entered. All identifying information concerning unfounded reports not retained for three years made by non-mandated reporters shall be retained by the SCR for 30 days after the final finding report is entered. All identifying information concerning any unfounded report involving Department wards shall be retained for 60 days regardless of reporting source.

If the alleged perpetrator or caretaker requests, in writing, within 10 days after the date on the SCR-generated notice, that a record of the unfounded report be retained as evidence of false reporting, the SCR computer and hard copy files and the local index shall be maintained. Written requests postmarked more than 10 days after the date on the SCR notice and oral requests, that are not confirmed in writing, shall not be honored. The child abuse and neglect investigative file shall also be maintained. SCR will notify the local investigative unit when to destroy records of these unfounded false reports.

6)    Pending and Undetermined Reports
Child abuse and neglect reports that are pending or undetermined shall remain in the SCR computer and hard copy files, the local index, and the child abuse and neglect investigative file until a decision is reached.

c)    The retention schedule for indicated child abuse and neglect records involving juvenile perpetrators (persons under the age of 18 years) is as follows:

1)    If, after an investigation, reports are indicated and children between the ages of 10 and 18 are determined to be the perpetrator, reports that carry a five-year retention schedule will be expunged from the State Central Register after five years or at the perpetrator's 21st birthday, whichever is sooner.

2)    In the event that the same child between the ages of 10 and 18 is determined to be

an indicated perpetrator of another report that requires a five year retention schedule, the information concerning the previous reports and the subsequent report will be maintained at the State Central Register for a period of five years after the date of the subsequent report or until the perpetrator's 21st birthday, whichever is sooner.

3)    Reports that carry a 20 or 50 year retention schedule will be expunged from the State Central Register after five years or at the perpetrator's 23rd birthday, whichever is sooner.

4)    In the event that same child between the ages of 10 and 18 is subsequently determined to be an indicated perpetrator of an allegation carrying a 20 or 50 year retention schedule, the information concerning the previous reports and the subsequent report will be maintained at the State Central Register for a period of five years after the date of the subsequent report or until the perpetrator's 23rd birthday, whichever is sooner.

d)    All retained records shall be of a confidential nature and shall not be made available to the general public, except as provided for in Section 431.85.

(Source:  Amended at 27 Ill. Reg. 1130, effective January 15, 2003)

## Joint Committee on Administrative Rules

# ADMINISTRATIVE CODE

**TITLE 89: SOCIAL SERVICES**
**CHAPTER III: DEPARTMENT OF CHILDREN AND FAMILY SERVICES**
**SUBCHAPTER a: SERVICE DELIVERY**
**PART 300 REPORTS OF CHILD ABUSE AND NEGLECT**
**SECTION 300.20 DEFINITIONS**

### Section 300.20  Definitions

"Abused child" means a child whose parent or immediate family member, or any person responsible for the child's welfare, or any individual residing in the same home as the child, **o**r a paramour of the child's parent:

*inflicts, causes to be inflicted, or allows to be inflicted upon such child physical or mental injury, by other than accidental means, which causes death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function;*

*creates a substantial risk of physical or mental injury to such child by other than accidental means which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function;*

*commits or allows to be committed any sex offense against such child, as such sex offenses are defined in the Criminal Code of 1961, as amended, and extending those definitions of sex offenses to include children under 18 years of age;*

*commits or allows to be committed an act or acts of torture upon such child;*

*inflicts excessive corporal punishment; or*

*commits or allows to be committed the offense of female genital mutilation, as defined in Section 12-34 of the Criminal Code of 1961, against the child.* [325 ILCS 5/3]

"Act" means the Abused and Neglected Child Reporting Act [325 ILCS 5].

"CANTS/SACWIS 8" or "C/S8" means the Department's document titled Notification of a Report of Suspected Child Abuse and/or Neglect. This document explains the Department's child abuse/neglect allegation investigation process.



**EXHIBIT**

B

"CANTS/SACWIS 9" or "C/S9" means the Department's document titled Notification of Intent to Indicate Child Care Worker for Report of Child Abuse and/or Neglect. This document is used to notify a person that the Department plans to indicate that person as a perpetrator of child abuse/neglect.

"CANTS/SACWIS 10" or "C/S10" means the Department's document titled Notice of Intent to Indicate a Child Care Worker for Report of Child Abuse and/or Neglect-Questions and Answers. This is an informational document explaining the impact of a determination of indicated child abuse/neglect and the appeal process.

"CANTS/SACWIS 11" or "C/S11" means the Department's document titled Notification of Indicated Decision in an Employment Related Report of Suspected Child Abuse and/or Neglect. This is the document by which the Department notifies a person that the Department has determined that there is credible evidence that he or she is responsible for the child abuse or neglect described in that document.

"Caregiver" means the child's parents, guardian, custodian or relative with whom the child lives and who has primary responsibility for the care and supervision of the child.

"Child" means any person under the age of 18 years, unless legally emancipated by reason of marriage or entry into a branch of the United States armed services.

*"Child care facility" means any person, group of persons, agency, association or organization, whether established for gain or otherwise, who or which receives or arranges for care or placement of one or more children, unrelated to the operator of the facility, apart from the parents, with or without the transfer of the right of custody in any facility as defined in the Child Care Act of 1969, established and maintained for the care of children. Child care facility includes a relative who is licensed as a foster family home under Section 4 of the Child Care Act of 1969.* [225 ILCS 10/2.05]

"Child care worker" means any person who is employed to work directly with children and any person who is an owner/operator of a child care facility, regardless of whether the facility is licensed by the Department. Child care facilities, for purposes of this definition, include child care institutions; child welfare agencies; day care/night care centers; day care/night care homes; day care/night care group day care homes; group homes; hospitals or health care facilities; schools, including school teachers and administrators, but not tenured school teachers or administrators who have other disciplinary processes available to them; and before and after school programs, recreational programs and summer camps. "Child care worker" also means persons employed as full-time nannies. A child care worker may, at his or her discretion, be subject to this Part if alleged to be responsible for child abuse or neglect outside of his or her employment. "Child care worker" includes a person: currently employed as a child care worker; currently

enrolled in an academic program that leads to a position as a child care worker; or who has applied for a license required for a child care worker position.  A person will be considered to be "employed as a child care worker" under this Part if, at the time of the notice of the investigation, he or she: has applied for, or will apply within 180 days for, a position as a child care worker; is enrolled in, or will commence within 180 days, an academic program that leads to a position as a child care worker; or has applied for a license as a child care worker.

*"Child Protective Service Unit" (CPS) means certain specialized State employees of the Department assigned by the Director or his or her designee to perform the duties and responsibilities* described  under this Part. CPS staff is also referred to as investigative staff.  [325 ILCS 5/3]

"Children for whom the Department is legally responsible" means children for whom the Department has temporary protective custody, custody or guardianship via court order, or children whose parents have signed an adoptive surrender or voluntary placement agreement with the Department.

"CPSW" means a Child Protective Service Worker.

"Collateral contact" means obtaining information concerning a child, parent, or other person responsible for the child from a person who has knowledge of the family situation but was not directly involved in referring the child or family to the Department for services.

"Credible evidence of child abuse or neglect" means that the available facts, when viewed in light of surrounding circumstances, would cause a reasonable person to believe that a child was abused or neglected.

"Delegation of an investigation" means the investigation of a report of child abuse or neglect has been deferred to another authority.  The Department maintains responsibility for determining whether the report is indicated or unfounded, entering information about the report in the State Central Register and notifying the subjects of the report and mandated reporters of the results of the investigation.

"Department" or "DCFS" means the Department of Children and Family Services.

"Determination" means a final Department decision about whether there is credible evidence that child abuse or neglect occurred.  A determination must be either "indicated" or "unfounded."

"Disfigurement" means a serious or protracted blemish, scar, or deformity that spoils a person's appearance or limits bodily functions.

"Formal investigation" means those activities conducted by Department investigative staff necessary to make a determination as to whether a report of suspected child abuse or neglect is indicated or unfounded.  Those

activities shall include:  *an evaluation of the environment of the child named in the report and any other children in the same environment; a determination of the risk to such children if they continue to remain in the existing environments, as well as a determination of the nature, extent and cause of any condition enumerated in such report, the name, age and condition of other children in the environment; and an evaluation as to whether there would be an immediate and urgent necessity to remove the child from the environment if appropriate family preservation services were provided. After seeing to the safety of the child or children, the Department shall forthwith notify the subjects of the report, in writing, of the existence of the report and their rights existing under* the *Act in regard to amendment or expungement.* [325 ILCS 5/3]

"Godparent" is a person who sponsors a child at baptism or one in whom the parents have entrusted a special duty that includes assisting in raising a child if the parent cannot raise the child.  The worker shall verify the godparent/godchild relationship by contacting the parents to confirm the fact that they did, in fact, designate the person as the godparent.  If the parents are unavailable, the worker should contact other close family members to verify the relationship.  If the person is considered to be the child's godparent, in order for placement to occur, the same placement selection criteria as contained in 89 Ill. Adm. Code 301.60  (Placement Selection) must be met.  If the godparent is not a licensed foster parent, all the conditions currently in effect for placement with relatives in 89 Ill. Adm. Code 301.80 must be met.

"Indicated report" means any report of child abuse or neglect made to the Department for which it is determined, after an investigation, that credible evidence of the alleged abuse or neglect exists.

"Initial investigation" means those activities conducted by Department investigative staff to determine whether a report of suspected child abuse or neglect is a good faith indication of abuse or neglect and, therefore, requires a formal investigation.  Good faith in this context means that the report was made with the honest intention to identify actual child abuse or neglect.

"Initial oral report" means a report alleging child abuse or neglect for which the State Central Register has no prior records on the family.

"Involved subject" means a child who is the alleged victim of child abuse or neglect or a person who is the alleged perpetrator of the child abuse or neglect.

"Local law enforcement agency" means the police of a city, town, village or other incorporated area or the sheriff of an unincorporated area or any sworn officer of the Illinois Department of State Police.

"Mandated reporters" means those individuals required to report suspected child abuse or neglect to the Department.  A list of these persons and their associated responsibilities is provided in Section 300.30 of this Part.

"Member of the clergy" means a clergyman or practitioner of any religious denomination accredited by the religious body to which he or she belongs. [325 ILCS 5/3]

"Neglected child" means any child who is not receiving the proper or necessary nourishment or medically indicated treatment including food or care not provided solely on the basis of present or anticipated mental or physical impairment as determined by a physician acting alone or in consultation with other physicians or otherwise is not receiving the proper or necessary support, or medical or other remedial care recognized under State law as necessary for a child's well-being (including where there is harm or substantial risk of harm to the child's health or welfare), or other care necessary for a child's well-being, including adequate food, clothing and shelter; or who is abandoned by his or her parents or other person responsible for the child's welfare without a proper plan of care; or who is a newborn infant whose blood, urine or meconium contains any amount of controlled substance as defined in subsection (f) of Section 102 of the Illinois Controlled Substances Act or a metabolite thereof, with the exception of a controlled substance or metabolite thereof whose presence in the newborn infant is the result of medical treatment administered to the mother or newborn infant. A child shall not be considered neglected for the sole reason that the child's parent or other person responsible for his or her welfare has left the child in the care of an adult relative for any period of time. A child shall not be considered neglected or abused for the sole reason that such child's parent or other person responsible for his or her welfare depends upon spiritual means through prayer alone for the treatment or cure of disease or remedial care under Section 4 of the Abused and Neglected Child Reporting Act. Where the circumstances indicate harm or substantial risk of harm to the child's health or welfare and necessary medical care is not being provided to treat or prevent that harm or risk of harm because such parent or other person responsible for the child's welfare depends upon spiritual means alone for treatment or cure, such child is subject to the requirements of this Act for the reporting of, investigation of, and provision of protective services with respect to such child and his health needs, and in such cases spiritual means through prayer alone for the treatment or cure of disease or for remedial care will not be recognized as a substitute for such necessary medical care, if the Department or, as necessary, a juvenile court determines that medical care is necessary. A child shall not be considered neglected or abused solely because the child is not attending school in accordance with the requirements of Article 26 of the School Code. [325 ILCS 5/3]

"Perpetrator" means a person who, as a result of investigation, has been determined by the Department to have caused child abuse or neglect.

"Person responsible for the child's welfare" means the child's parent, guardian, foster parent, relative caregiver, an operator, supervisor, or employee of a public or private residential agency or institution or public or private profit or not-for-profit child care facility; or any other person

*responsible for the child's welfare at the time of the alleged abuse or neglect, or any person who came to know the child through an official capacity or position of trust, including but not limited to health care professionals, educational personnel, recreational supervisors, members of the clergy and volunteers or support personnel in any setting where children may be subject to abuse or neglect.* [325 ILCS 5/3]

"Private guardianship" means an individual person appointed by the court to assume the responsibilities of the guardianship of the person as defined in Section 1-3 of the Juvenile Court Act of 1987 [705 ILCS 405/1-3] or Article XI of the Probate Act of 1975 [755 ILCS 5/Art. XI].

*"Relative",* for purposes of placement of children for whom the Department is legally responsible, *means any person, 21 years of age or over, other than the parent, who:*

*is currently related to the child in any of the following ways by blood or adoption: grandparent, sibling, great-grandparent, uncle, aunt, nephew, niece, first cousin,* first cousin once removed (children of one's first cousin to oneself), *second cousin* (children of first cousins are second cousins to each other), *godparent* (as defined in this Section), *great-uncle, or great-aunt, or*

*is the spouse of such a relative, or*

*is the child's step-father, step-mother, or adult step-brother or step-sister.*

*Relative also includes a person related in any of the foregoing ways to a sibling of a child, even though the person is not related to the child, when the child and its sibling are placed together with that person.* [20 ILCS 505/7 (b)]

"State Central Registry" is the record of child abuse and/or neglect reports maintained by the Department pursuant to the Act.

"Subject of a report" means any child reported to the child abuse/neglect State Central Register, and his or her parent, personal guardian or other person responsible for the child's welfare who is named in the report.

"Temporary protective custody" means custody within a hospital or other medical facility or a place previously designated by the Department, subject to review by the Court.  Temporary protective custody cannot exceed 48 hours excluding Saturdays, Sundays and holidays.

"Undetermined report" means any report of child abuse or neglect made to the Department in which it was not possible to complete an investigation within 60 days on the basis of information provided to the Department.

"Unfounded report" means any report of child abuse or neglect for which it

is determined, after an investigation, that no credible evidence of the alleged abuse or neglect exists.

(Source:  Amended by peremptory rulemaking at 29 Ill. Reg. 21065, effective December 8, 2005)

## Joint Committee on Administrative Rules

# ADMINISTRATIVE CODE

**TITLE 89: SOCIAL SERVICES**
**CHAPTER III: DEPARTMENT OF CHILDREN AND FAMILY SERVICES**
**SUBCHAPTER b: PROGRAM AND TECHNICAL SUPPORT**
**PART 336 APPEAL OF CHILD ABUSE AND NEGLECT INVESTIGATION FINDINGS**
**SECTION 336.120 THE ADMINISTRATIVE LAW JUDGE**

---

### Section 336.120  The Administrative Law Judge

a)     Appointment of the Administrative Law Judge
The Chief Administrative Law Judge shall select a trained, impartial Administrative Law Judge from the available pool to conduct the appeal hearing. The Administrative Law Judge shall:

    1)     be an attorney licensed to practice law in the State of Illinois;

    2)     possess knowledge and information acquired through training and/or experience relevant to the field of child and family welfare law, including familiarity with Department rules, procedures and functions;

    3)     not have been involved in the decision to take the action being appealed or have rendered legal advice to the decision-maker on the issue; and

    4)     not have a personal or professional interest that interferes with exercising objectivity or have any bias against the parties or issues appealed. An adverse ruling, in and of itself, shall not constitute bias or conflict of interest.

b)     Functions of the Administrative Law Judge
The Administrative Law Judge shall have all authority allowed under the Illinois Administrative Procedure Act [5 ILCS 100]. This authority shall include, but is not limited to, the following:

    1)     conduct a fair, impartial and formal hearing in which the strict rules of evidence do not apply;

    2)     provide for the recording of the hearing;

    3)     inform participants of their individual rights and their responsibilities;

    4)     conduct pre-hearing telephone conferences between the parties or their authorized representatives to provide information about the procedural aspects of the hearing, narrow the issues and discuss

**EXHIBIT**

**C**

possible stipulations and contested points of law, in order to expedite the actual hearing;

5)    have the authority to recommend changes in the child abuse and neglect report in the State Central Register;

6)    take necessary steps to develop a full and fair record that contains all relevant facts;

7)    administer an oath or an affirmation to all witnesses;

8)    quash or modify subpoenas for good cause, including but not limited to relevance, scope, materiality and emotional harm or trauma to the subpoenaed witness;

9)    allow into evidence all evidence helpful in determining whether an alleged perpetrator abused or neglected a child, including oral and written reports, which the Administrative Law Judge and the Director may rely upon to the extent of its probative value, even though not competent under the civil rules of evidence;

10)    allow into evidence previous statements made by the child relating to abuse or neglect as hearsay exceptions;

11)    preserve all documents and evidence for the record;

12)    rule upon evidentiary issues and contested issues of law at the hearing or take matters under advisement pending issuance of the written opinion and recommendation;

13)    order the removal of any person from the hearing room who is creating a disturbance, whether by physical actions, profanity or conduct, which disrupts the hearing;

14)    identify the issues, consider all relevant facts and receive or request any additional information necessary to decide the matter in dispute, including but not limited to additional testimony, documents, exhibits, briefs, memoranda of law or post hearing briefs; and

15)    present a written opinion and recommendation to the Director within 15 calendar days after the record of the administrative hearing is completed or transcript is received, whichever is later. This report shall include a recommended decision on whether there is a preponderance of evidence of abuse or neglect based on information in the administrative record.  The opinion shall contain findings of fact, conclusions of law and a recommendation.

(Source:  Amended at 24 Ill. Reg. 7660, effective June 1, 2000)